DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment entered by the Lawrence County Common Pleas Court overruling a petition for post-conviction relief filed by George Akers, petitioner below and appellant herein. The following errors are assigned for our review:
FIRST ASSIGNMENT OF ERROR:
 "THE TRIAL COURT VIOLATED MR. AKER'S RIGHTS TO DUE PROCESS AND TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE OHIO AND UNITED STATES CONSTITUTIONS WHEN IT DENIED MR. AKERS' CLAIM THAT HIS TRIAL COUNSEL WAS INEFFECTIVE IN HIS PRESENTATION OF THE DEFENSE."
SECOND ASSIGNMENT OF ERROR:
 "THE TRIAL COURT VIOLATED MR. AKERS' RIGHT TO DUE PROCESS AND TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE OHIO AND UNITED STATES CONSTITUTIONS WHEN IT REFUSED TO ALLOW TESTIMONY REGARDING COUNSEL'S INEFFECTIVE ASSISTANCE RELATING TO THE INVESTIGATIVE TECHNIQUES EMPLOYED IN THE INVESTIGATION OF THE ALLEGED VICTIMS' CLAIMS."
THIRD ASSIGNMENT OF ERROR:
 "THE TRIAL COURT VIOLATED MR. AKERS' RIGHTS TO DUE PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE OHIO AND UNITED STATES CONSTITUTIONS BY OVERRULING MR. AKERS' MOTION TO HOLD JUDGMENT IN ABEYANCE PENDING FILING OF A MOTION [TO] STRIKE THE TESTIMONY OF CHARLES KNIGHT, ESQ."
The record reveals the following facts pertinent to this appeal. On September 15, 1993, the Lawrence County Grand Jury indicted appellant on two (2) counts of rape in violation of R.C.2907.02, ten (10) counts of felonious sexual penetration in violation of R.C. 2907.12 and twenty-five (25) counts of gross sexual imposition in violation of R.C. 2907.05. Seven (7) of the felonious sexual penetration counts and twenty-two (22) of the gross sexual imposition counts were later dismissed. The remaining counts proceeded to trial and, on July 7, 1994, the jury found appellant guilty on three (3) of the gross sexual imposition counts but acquitted him on all other charges. A judgment of conviction and sentence was entered on July 13, 1994 sentencing him to consecutive two (2) year prison terms on each count for which he was convicted. No appeal was ever taken from that judgment.
On September 20, 1996, appellant filed a petition for post-conviction relief alleging that he had been deprived of his constitutional rights to effective assistance of counsel and due process of law. The gist of his argument was that trial counsel never objected, or presented rebuttal testimony, with respect to the following expert opinion of psychologist, David Lowenstein, Ph.D.:
 "Q. For my next question, Doctor, I want you to assume certain facts to be true, okay? Assume that we have young girls that have been sexually abused, assume that they have been abused by an adult male, assume that the girls were under the age of thirteen (13), assume even that one was as young as five years old, assume that the perpetrator, the adult male was a person of importance in the community, assume that he was a former Chief of Police, assume that he was a family figure with a family association. Assume all those things and assume that when this sexual abuse was taking place that the children did not report that they had been abused, assume also that they did not report being abused until several years later. Is there a psychological explanation for that?
 A. Yes, there is. And its been researched throughout the `80s and it's been called Child Sexual Abuse Accommodation Syndrome. Which is where a child is approached by an adult male and there is a bunch of different stages that occurs during this process. Starting out with secrecy being stage one. Where there is some implied threat. Now, a threat doesn't have to be towards bodily harm or actual death or some kind of event that's threatening, but it could also be, if you want to keep on getting some of the benefits of me being nice to you, etcetera etcetera, there is some would call it a threat, psychological threat. So, as a result of that, there is some secrecy that happens. The person who is the perpetrator has the power to be able to use this as a secret and keeps the child from maintaining its secrecy.
 The next stage is helplessness. When the person realizes that this is an authority figure of some sort, whether a family member, a person in the community, a next door neighbor, whatever, that they realize that they're helpless in preventing it from occurring again. As I said earlier, the definition of pedophilia is that it is recurring. It's more that one occasion.
 As time continues, the person starts realizing that this is not an appropriate behavior by the adult. So, they get into another stage called entrapment and abandonment. Where they're either feeling abandon by their family or entrapped in a situation that they can't do anything about it. And, this entrapment sometimes is also continuous with the threat of the perpetrator. Somehow assuming, the child assuming somehow that they're developing a relationship with the person who is the perpetrator. That they feel close, don't want to lose that love, this is their only connection.
 At some later point, there may be some delayed communication about it, a delayed, a disclosure we call it. A lot of times it's not believed in the family because it's been so delayed after an extensive period of time. But the person really has a difficult time sharing that information based on the fact of all the other stages that the patient has gone through from secrecy, helplessness and the entrapment and abandonment.
 Q. Doctor, in your experience and training is this a normal behavior of a young child that's been sexually . . .
 A. It's very common with children, especially young children. The younger the child when the incidents first happen, the more that level of secrecy and helplessness continue. And as a result, sometimes delayed communications can happen ten, fifteen, twenty years later."
Appellant argued in his petition that trial counsel should have investigated relevant law surrounding the so-called "Child Sexual Abuse Accommodation Syndrome" (hereinafter referred to as the "CSAA Syndrome"). Had such an investigation been undertaken, appellant continued, counsel would have learned that the CSAA Syndrome is generally viewed as suspect and should not be raised in child sexual abuse cases if the victims are competent to testify.
On October 15, 1996, appellant filed a fourteen (14) page affidavit in further support of his petition. The affiant, psychologist Jolie Brams, Ph.D., detailed her "findings and conclusions after an extensive review of the record pertaining to this case as well as consideration of psychological literature pertinent to the issues in this case." Dr. Brams opined that appellant's trial counsel "failed to present pertinent, readily available, and scientifically-based evidence that would have assisted the jury in understanding and evaluating the evidence presented during trial." In particular, she stated that trial counsel was "unfamiliar with available information concerning the complexities of child sexual abuse allegations, and related syndromes, or did not make an effort to present and/or use such information" to benefit his client. Dr. Brams explained, in the remaining twelve (12) pages of her affidavit, the complexities of child sexual abuse cases, the therapeutic nature of the CSAA Syndrome and her view of trial counsel's effectiveness in the instant case.
On April 22, 1997 the trial court overruled appellant's petition for post-conviction relief without a hearing. This Court reversed that judgment on the grounds that appellant's petition and supporting evidence set forth sufficient grounds for relief under R.C. 2953.21(C) that appellant should have been afforded an evidentiary hearing on his petition. See State v. Akers (Feb. 2, 1998), Lawrence App. No. 97CA22, unreported (hereinafter referred to as "Akers I"). The case was then remanded for further proceedings.
A hearing was held on May 21-22, 1998 at which time Dr. Brams further elaborated on the statements made in her previous affidavit. The witness explained that the CSAA Syndrome was formulated by a Dr. Ron Summit in the early 1980s to explain why some sexually abused children do not immediately report such abuse. She described this syndrome as follows:
 "Basically, Dr. Summit's proposition is this. Is that if you don't report sexual abuse, you've been sexually abused. And, if you report sexual abuse and recant it, you've been sexually abused. And, if you report sexual abuse, then you've been sexually abused. So basically, most professionals see that as very much a Catch-22 Syndrome. No matter what you do you've been sexually abused."
Dr. Brams further represented that Dr. Summit, himself, had since rejected the efficacy of this so-called syndrome and warned that it "should not be used in a probative manner." The witness testified that the CSAA Syndrome is not, and should not be used as, a diagnostic tool or an indicator of whether or not sexual abuse has occurred. Although Dr. Brams never directly opined that her colleague, Dr. Lowenstein, had used the CSAA Syndrome in this manner, she concluded that his testimony at the original trial was "inaccurate" and "negatively informative." She also alluded that trial counsel made serious mistakes by (1) failing to appropriately cross-examine Dr. Lowenstein, and (2) failing to call an expert witnesses in rebuttal to his testimony.
Concern over trial counsel's performance was also expressed by Ken Murray, attorney at law, who was called by appellant as a legal expert. Murray opined that trial counsel performed "well below" standards and was constitutionally ineffective. In particular, the witness criticized counsel for failing to have any "cohesive solid theory" of the case, failing to follow up with appropriate questions during voir dire and at trial and in failing to mount an attack against the expert testimony of Dr. Lowenstein by calling an expert for the defense. Mr. Murray concluded that he could discern no "reasonable strategic reason" for letting the testimony of Dr. Lowenstein go "unchallenged."
The State countered each of these points with evidence of its own. First, David Corwin, M.D., a child psychiatrist, testified that he was very familiar with the CSAA Syndrome and had even worked with Dr. Summit (who first formulated the syndrome) during his medical residency. The witness described the so-called syndrome as follows:
 "The Child Sexual Abuse Accommodation Syndrome is a description of the common attributes of child sexual abuse, common features. And also the common reactions and behaviors of children who have been sexually abused with regard to disclosure, to the phenomenon of recantation that occurs in some cases. That's essentially what it is. * * * It's a pulling together of observations of many professionals of child sexual abuse cases.
 And, it was specifically written and intended for the purpose of disabusing [sic] judges and jurors and other professionals, although primarily focused on judges and jurors, of commonly held misconceptions.
 Principally, that if a child, the principal misconception is that if a child is sexually abused they should be expected to disclose that immediately. And to be consistent and persistent in their description of that. Which is very, although it's kind of a common sense approach and the law really kind of views that as a measure of validity, it's very uncommon in child sexual abuse cases to have that kind of clean quick disclosure consistent telling. And that there are many reasons why disclosures of child sexual abuse are often delayed, often conflicted, they are sometimes recanted.
 The Child Sexual Abuse Accommodation Syndrome was Dr. Summit's effort to educate about what had been established and become known by professionals dealing with child sexual abuse cases. It was not intended as a as a [sic] diagnosis device or a set of criteria to use to decide if a child had been sexually abuse."
Although Dr. Corwin agreed with Dr. Brams insofar as the principle that the CSAA Syndrome could not properly be used as an indicator of whether sexual abuse occurred, he disagreed with her characterization that it had been disavowed by its progenitor (Dr. Summit) or that it lacked any efficacy in understanding why reports of sexual abuse are sometimes delayed. He further affirmed that "[t]he mainstream and the vast majority of publications in child abuse and neglect have respected and supported and reaffirmed and proven components . . . such as delayed disclosure." The witness explained the attacks which had been made on Dr. Summit's work, and the CSAA Syndrome, as follows:
 "There is a fringe literature which is largely unpeer reviewed published by professionals who testify frequently for sides seeking to try to disprove or refute allegations of sexual abuse. That, as I previously testified, has kind of misconstrued the Child Sexual Abuse Accommodation Syndrome, caricatured it and then attacked the caricature as if they're attacking the actual writings and syndrome which is wrong."
Dr. Corwin went on to state that he had reviewed the expert testimony given by Dr. Lowenstein (at the original trial) and found that the syndrome was appropriately used and discussed. The witness particularly noted that Dr. Lowenstein had never used the syndrome to "prove that these young people [were] telling the truth." In fact, he concluded, Dr. Lowenstein "was very clear on cross examination in acknowledging he had not met [the children] evaluated them, he had no opinion on their credibility."
The State also called Charles Knight, attorney at law, to testify as an expert legal witness. Knight disagreed with the conclusions of appellant's legal expert (Murray) and found that effective representation was provided by trial counsel. The witness explained that trial counsel did have "a clear and concise theory of his defense" which was that appellant "did not do these acts." To that end, Mr. Knight continued, trial counsel decided to have appellant testify on his own behalf and then "throughout the trial . . . cas[t] doubt on the credibility of the purported victims and to rely on the credibility of [appellant], not only to his former reputation in the community, but the fact that he was going to take the stand and deny." Insofar as the testimony by Dr. Lowenstein, Knight concluded that trial counsel's strategy was to avoid emphasizing the CSAA Syndrome and to get the state's expert witness "off the stand" as quickly as possible. Mr. Knight explained as follows:
 "The expert who testified for the state had not interviewed any of the victims and defense counsel brought that out in his cross. The expert who testified for the state testified in general terms as to the psychological theory he was professing. To emphasize that by defense cross examination I believe would have been a mistake. Defense counsel didn't do that.
 Defense counsel on cross examination went to the false memory syndrome. Which I believe was an appropriate way to try to bring before the jury that these people hadn't talked these . . . victims hadn't brought this forth for many years and those memories could be false. I think he did the right way to go about the expert."
The matter was submitted for determination and each side thereafter filed post-hearing memoranda. On August 7, 1998, appellant filed a motion asking the trial court to "hold [its] judgment in abeyance pending filing of a motion to strike." The gist of his motion was that Knight, the state's legal expert at the hearing, had (1) worked for the Ohio Public Defender Commission at the time the petition for post-conviction relief had been filed[1], and (2) been consulted by appellant's wife as to the couple's legal rights in avoiding a foreclosure of their home to satisfy fines and costs arising from the original criminal conviction. Appellant concluded that these relationships prohibited Knight from testifying at the hearing. He attached no documentation in support of these allegations but asked the trial court to hold, in abeyance, its decision on his petition for post-conviction relief until such time as he could assemble the appropriate evidence and include it in a motion to strike. Appellant's request was ultimately denied.
On August 17, 1998, the trial court filed a decision and judgment entry overruling appellant's petition for post-conviction relief. After summarizing testimony given by the various expert witnesses below, the court concluded that Dr. Lowenstein's testimony concerning the CSAA Syndrome (at the original criminal trial) was appropriate and that appellant's trial counsel "managed the defense of the case . . . as effective as it could have been." Thus, the court reasoned, appellant "enjoyed his constitutional guaranteed right to counsel during the trial of this case and that no grounds exist to justify granting [him] relief from the judgment." This appeal followed.
 I
We begin our analysis of this case by narrowing the precise issues presented to us on appeal and setting forth the parameters of our scope of review. First, the issue of whether expert testimony on the CSAA Syndrome should have been admitted at trial is not properly before us at this time.[2] This is an issue which should have been raised on direct appeal and will only be considered now in the context of appellant's claim of ineffective assistance of trial counsel. To that end, we note that a criminal defendant has the right to assistance of counsel which includes the right to effective assistance of counsel. McCann v.Richardson (1970), 397 U.S. 759, 770 at fn. 14.; also see Statev. Lytle (Mar. 10, 1997), Ross App. No. 96CA2182, unreported;State v. Doles (Sep. 18, 1991), Ross App. No. 1660, unreported. The United States Supreme Court in Strickland v. Washington
(1984), 466 U.S. 668, 687, developed the following test for determining whether counsel's representation was so defective as to require a reversal of the conviction:
 "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial [.]"
The Strickland standard has been adopted by the Ohio Supreme Court and is applied whenever a claim of ineffective assistance of counsel is raised in this State. See e.g. State v. Goodwin
(1999), 84 Ohio St.3d 331, 334; 703 N.E.2d 1251, 1256; State v.Goff (1998), 82 Ohio St.3d 123, 139, 694 N.E.2d 916, 929; Statev. Loza (1994), 71 Ohio St.3d 61, 83, 641 N.E.2d 1082, 1105. Attorneys licensed in Ohio are presumed competent. State v. Lott
(1990), 51 Ohio St.3d 160, 174, 555 N.E.2d 293, 303; State v.Smith (1985), 17 Ohio St.3d 98, 100, 477 N.E.2d 1128, 1131,Vaughn v. Maxwell (1965), 2 Ohio St.2d 299, 301, 209 N.E.2d 164,166; also see Kimmelman v. Morrison (1986), 477 U.S. 365, 381
(defense counsel's competence is presumed). Therefore, in reviewing ineffective assistance of counsel claims, appellate courts must be "highly deferential" to counsel's performance, indulge a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance and refrain from "second-guessing" counsel's strategic decisions at trial. See State v. Carter (1995), 72 Ohio St.3d 545, 558,651 N.E.2d 965, 977; State v. Frazier (1991), 61 Ohio St.3d 247, 253;574 N.E.2d 483, 488; State v. Bradley (1989), 42 Ohio St.3d 136,142, 538 N.E.2d 373, 379.
Moreover, we must keep in mind that these standards are to be applied within the framework of appellate review of a judgment denying post-conviction relief. Such review presents mixed questions of law and fact. State v. Johnson (Oct. 22, 1998), Ross App. No. 98CA2397, unreported; State v. Losey (Jun. 3, 1998), Athens App. No. 97CA43, unreported; also see Maynard v. Lockhart
(C.A.8 1992), 981 F.2d 981, 986. The trial court sits as trier of fact during hearings on post-conviction relief, State v. Bradley
(Mar. 30, 1999), Scioto App. No. 98CA2592, unreported, and its determination of factual issues will not be reversed unless they are shown to be against the manifest weight of the evidence. Id.;also see e.g., State v. Wombold (Feb. 19, 1999), Montgomery App. No. 17191, unreported. Generally speaking, judgments will not be reversed as against the manifest weight of the evidence so long as they are supported by some competent and credible evidence.Gerijo, Inc. v. Fairfield (1994), 70 Ohio St.3d 223, 226,638 N.E.2d 533, 536; Vogel v. Wells (1991), 57 Ohio St.3d 91, 96,566 N.E.2d 154, 159; C.E. Morris Co. v. Foley Construction Co. (1978)54 Ohio St.2d 279, 376 N.E.2d 578, at the syllabus. This Court will then independently determine, as a matter of law, whether the record establishes a constitutional violation of appellant's rights such that post-conviction relief should have been granted.Johnson, supra; Losey, supra; State v. Morehouse (Aug. 12, 1997), Meigs App. No. 96CA25, unreported. With these principles in mind, we turn our attention to the individual errors assigned for our review.
 II
Appellant argues in his first assignment of error that the trial court erred in overruling his petition for post-conviction relief. We disagree. From the outset, appellant's claim of ineffective legal assistance has centered largely on the manner by which his trial counsel handled (or did not handle) the expert testimony of Dr. Lowenstein. He argues that his attorney was deficient because he should have (1) challenged the admissibility of testimony concerning the CSAA Syndrome, (2) more thoroughly impeached the reliability or credibility of Dr. Lowenstein's testimony and (3) obtained the services of an expert psychiatric witness. We will address each of these points individually.
First, appellant cites us to a number of cases for the proposition that Ohio law prohibited the introduction of expert testimony concerning CSAA Syndrome during the trial below.[3]
He argues that, given this caselaw, the testimony of Dr. Lowenstein would have been excluded had counsel challenged its admissibility. Appellant concludes that the failure to mount such a challenge is indicative of ineffective assistance. We are not persuaded.
The flaw in appellant's argument is that the caselaw upon which he relies is distinguishable from the factual scenario at issue in the cause sub judice. The cases cited to us all involved experts who had examined (counseled) the alleged victims and/or were attempting to bolster their credibility.[4] This was not the case here. Dr. Lowenstein clearly testified, before rendering the previously cited expert opinion, that he had not met with the alleged victims. Therefore, he could not render any opinion as to whether they were in fact suffering from CSAA Syndrome. Dr. Lowenstein also made clear that he was not passing on the credibility of the alleged victims or attempting to bolster evidence that sexual abuse had occurred. Rather, he was merely explaining CSAA Syndrome in general terms and did not attempt to link or to apply that syndrome to the alleged victims as did the experts in those cases cited to us by appellant. Even Dr. Brams, appellant's own expert witness, conceded at the hearing below that Dr. Lowenstein never diagnosed CSAA Syndrome as applying in this case, never attempted to make any determination that sexual abuse actually occurred and never tried to bolster the credibility of the alleged victims.
This is a significant distinction from the cases upon which appellant relies because there has never been a blanket prohibition against expert testimony in child sexual abuse cases. It is certainly true that an expert may not testify as to his or her opinion of the veracity of the accuser. State v. Boston
(1989), 46 Ohio St.3d 108, 545 N.E.2d 1220, at the syllabus. However, the Supreme Court has never held that expert testimony is always per se inadmissible in child sexual abuse trials. The Boston case should not be read as encompassing, and barring, all such testimony. Expert testimony is, in fact, allowed if it assists the trier of fact in understanding the evidence. Id. at 120, 545 N.E.2d at 1232; State v. Gersin (1996), 76 Ohio St.3d 491,494, 668 N.E.2d 486, 488. The prosecution may therefore introduce such testimony on the characteristic psychological symptoms of a typically abused child as evidence supporting allegations that a particular child has been abused. Seegenerally State v. Nemeth (1998), 82 Ohio St.3d 202, 206,694 N.E.2d 1332, 1335, at fn. 1; State v. Stowers (1998), 81 Ohio St.3d 260,261-262, 690 N.E.2d 881, 883.
Appellant's argument is also based on the questionable premise that the trial court would have, ipso facto, excluded this evidence below. Admissibility of expert testimony on the CSAA Syndrome has never been expressly addressed by the Ohio Supreme Court and this "Court has not previously considered it either. The cases cited by appellant (for the proposition that this evidence should have been excluded from trial) all emanate from other appellate districts and, thus, were not controlling authority on the court below. See S.Ct.R.Rep.Op. 2 (G). Further, given that those cases upon which he relies are clearly distinguishable from the factual posture of the cause sub judice, it is not at all clear that Dr. Lowenstein's testimony would have been excluded even if trial counsel had objected and argued that it was inadmissible. This makes it increasingly more difficult for appellant to satisfy the prejudice requirement underStrickland.
It is worth repeating at this juncture that we are not deciding whether evidence of CSAA Syndrome was properly admitted below. That was an issue for direct appeal and it is not properly before us at this time. However, given recent caselaw by the Ohio Supreme Court clarifying when expert testimony can be used, and considering more recent decisions from other appellate districts allowing expert testimony on general behavioral characteristics of sexually abused children, see e.g. State v. Daniel (1994),97 Ohio App.3d 548, 564, 647 N.E.2d 174, 185, appellant has not persuaded us that Dr. Lowenstein's testimony was inadmissible.[5]
We do not necessarily dispute appellant's basic premise that an objection to this testimony would have been warranted. The question before us, however, is not whether counsel erred by failing to make such aft objection but whether he erred so seriously that he no longer functioned with constitutional effectiveness. See Strickland, supra at 687. We ultimately answer that question in the negative.
If the testimony of Dr. Lowenstein was admissible, then counsel's failure to make a perfunctory and meritless objection cannot be characterized as ineffective. See e.g. United Statesv. Dixon (C.A.10 1993), 1 F.3d 1080, 1083 at fn. 5; Card v.Dugger (C.A.11 1990), 911 F.2d 1494, 1520; Boag v. Raines (C.A.9 1985), 769 F.2d 1341, 1344. On the other hand, if expert testimony of this sort was inadmissible, counsel would still have had a reasonable basis (given the caselaw and Dr. Lowenstein's precatory comment that he had never met with any of the alleged victims) to believe that such evidence was properly introduced. There is also no clear indication that, even if inadmissible, the trial court would have excluded such testimony from evidence. Appellant's authority to that effect is both distinguishable from the cause sub judice and, in any event, was not binding on the court below. In short, he has not demonstrated that either prong of the Strickland test has been met. This Court will not simply assume there was constitutional error, or resultant prejudice, but will require that they be affirmatively shown. See State v.Kuntz (Feb. 26, 1992), Ross App. No. 1691, unreported; State v.Penix (Oct. 23, 1991), Scioto App. No. 90CA1887, unreported;State v. Maughmer (Feb. 7, 1991), Ross App. No. 1667, unreported. Appellant has not demonstrated those factors in this instance and, thus, we cannot find that counsel was constitutionally ineffective for failing to object to the introduction, or challenge the admissibility, of this evidence at trial.
Appellant's next argument is that counsel was deficient in his cross-examination of Dr. Lowenstein. We note at the outset that defense counsel did not simply allow this witness to leave the stand without challenging his testimony. Instead, Dr. Lowenstein was questioned about false suppressed memories as well as the possibility that the accusations against appellant may have stemmed from "anger or dislike" on the part of the alleged victims. Counsel also elicited a repeat admission from Dr. Lowenstein that he had not examined the alleged victims and could not vouch for whether they were "telling the truth or making these stories up." Nevertheless, appellant contends that his attorney was constitutionally ineffective for not being more thorough in his cross-examination and going to greater lengths to impeach the reliability and credibility of this witness. We disagree.
As mentioned previously, when reviewing claims of ineffective assistance of counsel, courts are admonished to refrain from second-guessing "strategic decisions" made by defense attorneys.See Carter, supra at 558, 651 N.E.2d at 977; Frazier, supra at 253, 574 N.E.2d at 488; Bradley, supra at 142, 538 N.E.2d at 379. Trial tactics, even debatable ones, are generally not subject to question by a reviewing court. See State v. McNeil (1998),83 Ohio St.3d 438, 449, 700 N.E.2d 596, 608; State v. Phillips
(1995), 74 Ohio St.3d 72, 85, 656 N.E.2d 643, 658; also seeSherron v. Norris (C.A.8 1995), 69 F.3d 285, 290; United Statesv. Limehouse (C.A.7 1991), 950 F.2d 501, 504. Defense counsel's strategy must have been so outside the realm of legitimate trial strategy as "to make ordinary counsel scoff" before a conviction will be reversed on the basis of ineffective assistance. SeeState v. Yarber (1995), 102 Ohio App.3d 185, 188,656 N.E.2d 1322, 1324; State v. Burgins (1988), 44 Ohio App.3d 158, 160,542 N.E.2d 707, 709-710; State v. Moore (Mar 21, 1998), Franklin App. No. 97APA07-896, unreported. This is a heavy burden to meet and appellant has not met it here.
The state's legal expert, Charles Knight, testified below that further cross-examination of Dr. Lowenstein ran the risk of emphasizing CSAA Syndrome in the minds of the jurors and that this would have been, in his opinion, "a mistake." He opined that it was a "good tactic" to get Dr. Lowenstein "off the stand" as quickly as possible.[6] While this Court does not pass judgment on the advisability of such a tactic, we do agree with Knight that this appears to have been a strategic decision within the constitutional ambit afforded defense counsel under theStrickland standard.
It is also worth noting that Dr. Lowenstein's trial testimony was brief and spans barely sixteen (16) transcript pages for direct, cross and re-direct examination. The witness never addressed his opinion to any of the victims in particular and conceded, on several occasions, that he had not met with them and could not diagnose CSAA Syndrome in the cause sub judice. Dr. Corwin (the State's psychiatric expert) also testified that Dr. Lowenstein made "appropriate" use of CSAA Syndrome as a "heuristic organization" to simply educate "the jury about factors related to delay and disclosure principally" without using it to "bolster" credibility or prove that the alleged victims were telling the truth. Given these factors, counsel may have reasonably believed that it was better to forego a prolonged attack upon this psychological theory and focus on other issues, such as possible false accusations or the failure of the expert to ever meet with any of the alleged victims, rather than run the risk of emphasizing the syndrome to the jury.[7] Accordingly, we cannot conclude that counsel was ineffective for failing to further pursue cross-examination.
Appellant's final argument is that counsel was deficient for failing to engage an expert psychological witness to assist in his defense. Again, we disagree. This argument fails for much the same reason as his contention that cross-examination was deficient. Defense counsel appears to have made the tactical decision to avoid focusing on the psychological issues raised by Dr. Lowenstein for fear of emphasizing them in the collective minds of the jury. That being the case, there would have been no particular need for the defense to have retained its own expert. This is particularly true insofar as calling an expert witness to rebut the opinion of the state's expert. Ken Murray, appellant's own legal expert, even agreed that "there could be strategic reasons for not putting on a counter expert so as to avoid "re-emphasiz[ing] a particular point."
We would also point out that the decision of whether or not to call an expert is generally considered a matter of trial strategy. See State v. Coleman (1989), 45 Ohio St.3d 298, 308,544 N.E.2d 622, 633, and a decision by counsel to forego such witnesses for the defense will not sustain an ineffective assistance of counsel claim. State v. Nicholas (1993), 66 Ohio St.3d 431,436, 613 N.E.2d 225, 230; State v. Thompson (1987),33 Ohio St.3d 1, 10-11, 514 N.E.2d 407, 417. For these reasons, we find nothing deficient in defense counsel's failure to retain an expert psychological witness.
As a final matter, we note that the determination of whether trial counsel's actions were legitimate tactical decisions was a question of fact for the court below. See Porter v. Singletary
(C.A.11 1994), 14 F.3d 554, 558; Horton v. Zant (C.A.11 1991),941 F.2d 1449, 1462. The trial court determined that they were in this instance and we find ample evidence in the record to support that conclusion. Charles Knight testified that appellant's trial attorney provided effective assistance and that it was a "good tactic" to get Dr. Lowenstein "off the stand" as quickly as possible so as to avoid emphasizing the CSAA Syndrome. He further opined that trial counsel's strategy was to deny the allegations, cast doubt on the victims' credibility and rely on his own credibility and standing in the community rather than becoming bogged down in arguing the efficacy of psychological studies.
Although Murray (appellant's legal expert) testified to the contrary, the relative weight to be given this evidence and the credibility to afford each of these witnesses was a question for the trier of fact. See State v. Frazier (1995), 73 Ohio St.3d 323,339, 652 N.E.2d 1000, 1014; State v. Rojas (1992), 64 Ohio St.3d 131,139, 592 N.E.2d 1376, 1384; State v. DeHass (1968),10 Ohio St.2d 230, 227 N.E.2d 212, at paragraph one of the syllabus. We are very much aware that the lower court was in a better position that us to view the witnesses and observe their demeanor, gestures and voice inflections and use those observations in weighing the proffered testimony. See Myers v.Garson (1993), 66 Ohio St.3d 610, 615, 614 N.E.2d 742, 745;Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80,461 N.E.2d 1273, 1276. Thus, the trial court was free to believe all, part or none of the testimony of each witness who appeared before it. State v. Nichols (1993), 85 Ohio App.3d 65, 76,619 N.E.2d 80, 88; State v. Caldwell (1992), 79 Ohio App.3d 667, 679,607 N.E.2d 1096, 1104; State v. Harriston (1989), 63 Ohio App.3d 58,63, 577 N.E.2d 1144, 1147. The trial court simply found Knight's opinion of trial counsel's actions more persuasive that Murray's opinion. We discern no error in that finding.
Moreover, after reviewing the record of this case de novo, we reach the same conclusion as the trial court and hold that appellant was not deprived of his constitutional right(s) to effective assistance of counsel. It would appear to us that trial counsel made a reasonably calculated tactical decision to avoid focusing on the general, non-specific, psychological testimony of Dr. Lowenstein and, instead, concentrate on other issues. Had Dr. Lowenstein met with the victims and attempted to bolster the credibility of their trial testimony, or tried to represent that sexual abuse had taken place, counsel's strategy might have been different. In any event, we agree with the trial court that counsel's actions did not fall beneath the minimum standards required for constitutional effectiveness. While it is clear that Murray, as well as appellant's present counsel, would have handled the defense differently, that is not what is required to be shown to demonstrate ineffective assistance. See Griffin v.Wainwright (C.A.11 1985), 760 F.2d 1505, 1513. Appellant was required to meet the standard(s) set forth in Strickland, supra, and we conclude that he failed to carry that burden below. His first assignment of error is consequently overruled.
 III[8]
Appellant's second assignment of error goes to the trial court's decision to sustain five (5) separate evidentiary objections made by the State during the post-conviction hearing below. He argues that these rulings were "unreasonable limitations" on his right to present evidence thereby depriving him of due process of law. We disagree.
Our analysis begins from the well settled principle that the admission or exclusion of relevant evidence is a matter within the sound discretion of the trial court and a reviewing court may reverse only upon the showing of an abuse of that discretion. SeeState v. Dunlap (1995), 73 Ohio St.3d 308, 316, 652 N.E.2d 988,996; Rigby v. Lake Cty. (1991), 58 Ohio St.3d 269, 271,569 N.E.2d 1056, 1058; State v. Sage (1987), 31 Ohio St.3d 173,510 N.E.2d 343, at paragraph two of the syllabus. An abuse of discretion is more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. See e.g. Landis v. Grange Mut. Ins. Co. (1998),82 Ohio St.3d 339, 342, 695 N.E.2d 1140, 1142; Malone v.Courtyard by Marriott L.P. (1996), 74 Ohio St.3d 440, 448,659 N.E.2d 1242, 1249; State ex rel. Solomon v. Police Firemen'sDisability Pension Fund Bd. of Trustees (1995), 72 Ohio St.3d 62,64, 647 N.E.2d 486, 488. An abuse of discretion means that the result is so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but, instead, passion or bias. Nakoffv. Fairview Gen. Hosp. (1996), 75 Ohio St.3d 254, 256,662 N.E.2d 1, 3. Further, appellate courts are cautioned that they should not merely substitute their own judgment on these matters for that of the trial court. See State ex rel. Duncan v. ChippewaTwp. Trustees (1995), 73 Ohio St.3d 728, 732, 654 N.E.2d 1254,1258; In re Jane Doe 1 (1991). 57 Ohio St.3d 135, 137-138,566 N.E.2d 1181, 1184; Berk v. Matthews (1990), 53 Ohio St.3d 161,169, 559 N.E.2d 1301, 1308. This is a difficult standard to meet and we are not persuaded that it was met here.
Appellant's brief does not individually discuss each of the evidentiary rulings he is challenging and, consequently, they will not be set out in detail here. However, after a thorough review of the transcript, we find no error in the trial court's various decisions limiting the scope of witness questioning. We also readily conclude that appellant was given an ample and fair opportunity to present evidence going to the issues specified by us in our previous remand in Akers I. The transcript of the hearing below spans more than four hundred (400) pages. Appellant's counsel engaged in extensive questioning of both his own psychological and legal experts as well as those who appeared on behalf of the State. The trial court's rulings do not appear to us to be arbitrary, unreasonable or unconscionable. Appellant's second assignment of error is therefore overruled.
 IV
Appellant's third assignment of error goes to the trial court's decision to overrule his motion to hold judgment on post-conviction relief "in abeyance pending filing of a motion to strike" the testimony given by the State's legal expert (Mr. Knight). He argues that the denial of this motion deprived him of both effective assistance of counsel and due process of law. Again, we disagree.
It is important to emphasize that the issue before us is not whether the testimony of Charles Knight should have been struck from the record, but whether the trial court erred in overruling appellant's request to hold judgment "in abeyance" until such time as a motion asking for such relief could be filed. To that end, we note that petitions for post-conviction relief are civil in nature. State v. Nichols (1984), 11 Ohio St.3d 40, 42,463 N.E.2d 375, 377; State v. Milanovitch (1975), 42 Ohio St.2d 46,49, 325 N.E.2d 540, 542. Neither the provisions of R.C. 2953.21et seg. nor the Ohio Rules of Civil Procedure authorize such action. Appellant has not cited us to any other authority which would have allowed for it and we have found none in our own research.
Assuming arguendo that the trial court was authorized to withhold judgment in this case, to accommodate the filing of a future motion, we would still not be convinced that there was any error in denying appellant's request. No evidentiary materials were submitted in support of the alleged attorney/client relationship between appellant, his wife and Knight.[9]
Furthermore, appellant gave no explanation as to why this alleged conflict could not have been discovered and brought to the court's attention during the two (2) day hearing. Our legal system is not favorably disposed to alleged errors which counsel could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected. See generally State v. Peagler (1996), 76 Ohio St.3d 496,499, 668 N.E.2d 489, 492; State v. Gordon (1971), 28 Ohio St.2d 45,276 N.E.2d 243, at paragraph two of the syllabus. Had these issues with Mr. Knight's testimony been brought out during the hearing, and if they had any merit, then the State would have had an opportunity to secure another expert witness. However, by waiting until after the hearing had concluded, and by seeking to strike the testimony all together rather than obtaining a new trial and allowing for the presentation of a new expert, appellant was essentially asking the trial court to take a position which would have severely prejudiced the rights of the State. Such a request, at the very least, required some degree of explanation as to why these problems could not have been discovered earlier. Appellant gave no such explanation. For these reasons, we find no merit in the third assignment of error and it is accordingly overruled.
Having reviewed all errors assigned and argued in appellant's brief, and after finding merit in none of them, the judgment of the trial court is hereby affirmed.
JUDGMENT AFFIRMED.
[1] Appellant was represented by the Public Defender's office at that time.
[2] We acknowledge the uncontroverted expert testimony below that the term "syndrome" is somewhat of a misnomer when discussing the CSAA Syndrome. Nevertheless, because that terminology was used throughout the hearing, we will use it here in order to remain consistent.
[3] Those cases include State v. Davis (1989), 64 Ohio App.3d 334,581 N.E.2d 604; State v. Hollon (Jan 28, 1991), Clermont App. No. CA 90-03-029, unreported; State v. Cobb (Mar. 18, 1993), Cuyahoga App. No. 61676, unreported; and State v. Givens (Nov. 9, 1992), Warren App. No. CA 92-01-015, unreported.
[4] In Davis, supra, the expert had interviewed the child and had given an opinion that the alleged sexual abuse had occurred.64 Ohio App.3d at 340-342, 581 N.E.2d at 608-609. The expert inHollon, supra, was the victim's therapist, had met with the child and opined at trial that she suffered from "post-traumatic stress disorder" (presumably as a result of the alleged sexual abuse). Similarly, in Givens, supra, two (2) different experts had met with the alleged victim and opined at trial that the child "was sexually abused." We concede that the factual recitation in Cobb,supra, makes it unclear whether the expert had actually met with the alleged victim. Nevertheless, the testimony of that expert was proffered for the express purpose of "assessing the credibility of witnesses." It is also worth pointing out that the expert in Cobb was offered by the defense. The testimony of that expert was not allowed and the precise question posited to the Cuyahoga County Court of Appeals was not whether the testimony was admissible but whether there was an abuse of discretion in ordering it excluded.
[5] Appellant counterargues in his brief that we should disregard these more recent cases and restrict our analysis to caselaw in existence at the time of the original criminal trial. We disagree. First, as discussed in detail previously in this opinion, the cases upon which appellant relies are factually distinguishable from the cause sub judice and, in any event, were not binding on the trial court. Second, judicial decisions generally apply retrospectively. King v. Safeco Ins. Co. (1990),66 Ohio App.3d 157, 161-163, 583 N.E.2d 1051, 1054-1055; Shockeyv. Our Lady of Mercy (Jun. 25, 1997), Hamilton App. No. C-960492, unreported. The effect of subsequent court decisions is not to make new law but only to hold that the law always meant what the court says it now means. King, supra at 162,583 N.E.2d at 1055.
[6] Knight also expressed that counsel's discussion of false memory syndrome with the expert witness might have been strategically engineered to emphasize the word "false" when considering the opinions of Dr. Lowenstein during deliberations.
[7] Though not dispositive, it is interesting to note the testimony of Dr. Brams, appellant's own psychological expert, who essentially agreed that further repetitive testimony could have solidified CSAA Syndrome this concept in the minds of the jurors.
[8] The two (2) remaining assignments of error challenge alleged evidentiary/procedural errors made during the course of the post-conviction proceedings below. Except for a passing reference to our previous remand in Akers I, appellant's brief cites no caselaw or statutes in support of either of the claimed errors as required by App.R. 16 (A) (7). Thus, both assignments of error could be disregarded and summarily overruled pursuant to App.R. 12 (A) (2). See Meerhoff v. Huntington Mtge Co. (1995),103 Ohio App.3d 164, 169, 658 N.E.2d 1109, 1113; State v. Riley
(Dec. 29, 1998), Vinton App. No. 98CA518, unreported; Hiles v.Veach (Nov. 20, 1998), Pike App. No. 97CA604, unreported. The interests of justice nevertheless compel us to consider them anyway.
[9] We acknowledge that a motion to strike, supported by affidavits and other exhibits, was filed by appellant on August 21, 1998 (four days after the trial court entered final judgment). However, neither the evidentiary materials nor the arguments contained therein are properly before us in this case.